## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BENCHMARK EXPORT SERVICES; FTS INTERNATIONAL EXPRESS, INC.; JSNP, INC.; OLARTE TRANSPORT SERVICE, INC.; R.I.M. LOGISTICS, LTD.; S.A.T. SEA & AIR TRANSPORT, INC.; VOLVO LOGISTICS AB, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>BRUCE MCCAFFREY,<br><br>    Defendant. | **Case No.**<br><br><br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS

Page

DEFINITIONS ...............................................................................................................1

NATURE OF THE ACTION...................................................................................... 2

JURISIDICTION AND VENUE....................................................................................3

PLAINTIFFS...................................................................................................................3

DEFENDANT .................................................................................................................5

NAMED CO-CONSPIRATORS .................................................................................. 6

UNNAMED CO-CONSPIRATORS ...........................................................................17

AGENTS...................................................................................................................... 18

AMNESTY RECEIPIENTS........................................................................................ 18

GUILTY PLEAS ......................................................................................................... 18

    Air France ........................................................................................................... 19

    Asiana Airlines.................................................................................................... 19

    British Airways ................................................................................................... 20

    Cargolux.............................................................................................................. 20

    Cathay Pacific .................................................................................................... 21

    De Jong ............................................................................................................... 21

    El Al .................................................................................................................... 22

    JAL...................................................................................................................... 22

    Korean Air .......................................................................................................... 22

    LAN Cargo and ABSA ....................................................................................... 23

    Martinair ............................................................................................................. 24

i

McCaffrey ................................................................................................................... 24

NCA .......................................................................................................................... 24

Packer...................................................................................................................... 25

Qantas ..................................................................................................................... 25

SAS ........................................................................................................................... 26

INDICTED NAMED CO-CONSPIRATOR.............................................................. 26

INTERSTATE AND INTERNATIONAL TRADE AND COMMERCE ................................... 27

FACTUAL ALLEGATIONS ............................................................................................29

Price-Fixing Scheme ............................................................................................29

Fuel Surcharge.......................................................................................................29

Security Surcharge ............................................................................................... 34

War Risk Surcharge ............................................................................................. 35

U.S. Customs Surcharge........................................................................................ 35

Concerted Refusal to Discount............................................................................36

Concerted Increases in Yields .............................................................................37

Allocation of Customers ......................................................................................38

Intent.........................................................................................................................38

FRAUDULENT CONCEALMENT.................................................................................. 38

CLASS ACTION ALLEGATIONS ................................................................................ 43

VIOLATION OF THE SHERMAN ACT ....................................................................... 46

PRAYER FOR RELIEF ..................................................................................................48

JURY TRIAL DEMAND ..................................................................................................49

Plaintiffs, by and through their undersigned counsel, complain and allege upon information and belief except as to those paragraphs applicable to the named Plaintiffs, which are based on personal knowledge, as follows.

## DEFINITIONS

1.      "Airfreight Carrier" means any airline acting as an Airfreight Shipping Services provider.

2.      "Airfreight Customer" means any person or entity purchasing Airfreight Shipping Services, excluding Defendants or any predecessor, subsidiary or affiliate of each.

3.      "Airfreight Shipping Services" means paid, private air transport of freight or other cargo by Airfreight Carriers.

4.      "Cartel" means the combination of Airfreight Carriers named herein that conspired to fix, raise, maintain, or stabilize the prices of Airfreight Shipping Services.

5.      "Class Period" refers to the period from January 1, 2000 to September 11, 2006.

6.      "Fuel Surcharge" means a Surcharge levied by an Airfreight Carrier upon Airfreight Customers purportedly to compensate the Airfreight Carrier for costs of fuel.

7.      "Security Surcharge" or "Insurance Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs associated with security measures or insurance implemented after the terrorist attacks in the United States on September 11, 2001 (hereinafter "September 11 attacks").

8.      "War Risk Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs of war-risk

insurance premiums and flight rerouting necessary in conjunction with the outbreak of war in Iraq in 2003.

9. "U.S. Customs Surcharge" means a Surcharge levied by an Airfreight Carrier upon an Airfreight Customer purportedly to compensate the Airfreight Carrier for costs associated with preparation of and electronic submission to U.S. Customs of a manifest of the freight that the Airfreight Carrier will offload in the United States.

10. "Surcharge" means a fee charged to an Airfreight Customer, in addition to Airfreight Shipping Services base rates, purportedly to compensate the Airfreight Carrier for certain external costs.

11. "Yield" means revenues per ton-mile. It is calculated by dividing operating revenues by the product of actual revenue tons and miles flown.

## NATURE OF THE ACTION

12. This action arises from Defendant's, Airfreight Carrier Named Co-Conspirators' and other named and unnamed co-conspirators' single, unitary, global and overarching conspiracy to fix, raise, maintain, or stabilize prices of Airfreight Shipping Services through a number of mechanisms, including, *inter alia*, concertedly levying inflated Surcharges, jointly agreeing to eliminate or prevent discounting of Airfreight Shipping Services prices, agreeing on rates and Yields, and allocating customers.

13. Plaintiffs bring this action to recover treble damages and the costs of this suit, including reasonable attorneys' fees, and secure injunctive relief for violations of Section 1 of the Sherman Act of 1890 ("Sherman Act"), 15 U.S.C. § 1, pursuant to Sections 4 and 16 of the Clayton Act of 1914 ("Clayton Act"), 15 U.S.C. §§ 15, 26.

14.     Plaintiffs bring this action on behalf of persons and entities that directly purchased Airfreight Shipping Services for shipments to, from, or within the United States.

## JURISDICTION AND VENUE

15.     This Court has original federal question jurisdiction over these Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16.     Defendant and his co-conspirators engaged in conduct both inside and outside of the United States that caused direct, substantial and reasonably foreseeable and intended anticompetitive effects upon interstate commerce within the United States, upon import trade and commerce with the United States and upon foreign commerce. The adverse effects of this anticompetitive conduct in the United States are interdependent with, and are linked directly to, the adverse effects outside the United States and gave rise to the injuries of the Plaintiffs located outside the United States.

17.     Personal jurisdiction and venue over Defendant is proper in this Judicial District in that Defendant resides in and/or is found in and/or is physically present in this Judicial District. *See* 28 U.S.C. § 1392(b) and 15 U.S.C. § 15.

## PLAINTIFFS

18.     Plaintiff Benchmark Export Services ("Benchmark") has its principal place of business at 108 A Erickson Ave., Essington, Pennsylvania 19029. Benchmark has been at all relevant times a freight forwarder in the U.S. and an Airfreight Customer. During the Class Period, Benchmark purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

3

19.     Plaintiff FTS International Express, Inc. ("FTS") has its principal place of business at 400 Country Club Drive, Bensenville, Illinois 60106.  FTS has been at all relevant times a freight forwarder and consolidator in the U.S. and an Airfreight Customer.  During the Class Period, FTS purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

20.     Plaintiff JSNP, Inc. ("JSNP") has its principal place of business at 1012 North Avenue 57, Los Angeles, California 90042.  JSNP has been at all relevant times a worldwide pet transporter in the U.S. and an Airfreight Customer.  During the Class Period, JSNP purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators for shipments within, to, or from the United States and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

21.     Plaintiff Olarte Transport Service, Inc. ("Olarte") has its principal place of business at 1125 E. Pico Boulevard, Los Angeles, CA 90021.  Olarte has been at all relevant times a freight forwarder in the U.S. and an Airfreight Customer.  During the Class Period, Olarte purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators for shipments within, to, or from the United States and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

22.     Plaintiff R.I.M. Logistics, Ltd. ("R.I.M.") has its principal place of business at 1325 Mittel Boulevard, Wood Dale, Illinois 60191.  R.I.M. has been at all relevant times a freight forwarder in the U.S. and an Airfreight Customer.  During the Class Period, R.I.M. purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier

Named Co-Conspirators for shipments within, to, or from the United States and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

23.     Plaintiff S.A.T. Sea & Air Transport, Inc. ("S.A.T.") is headquartered at 1200 South 192nd, Suite 200, Seattle, Washington 98148. S.A.T. has been at all relevant times an Airfreight Customer. During the Class Period, S.A.T. purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators for shipments within, to, or from the United States and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

24.     Plaintiff Volvo Logistics AB ("Volvo Logistics") is headquartered at 405 08 Göteborg, Sweden. Volvo Logistics, the logistics branch of the Volvo Group, provides, among other things, delivery of finished Volvo Group vehicles. Volvo Logistics' subsidiary companies, on whose behalf Volvo Logistics also brings this claim, include Volvo Logistics North America, Inc.; Volvo Logistics Europe (Belgium); Volvo Logistics Europe (France); Volvo Logistics (UK) Ltd.; and Volvo Logistics Scandinavia & Overseas (Brazil). Volvo Logistics has been at all relevant times an Airfreight Customer. During the Class Period, Volvo Logistics purchased Airfreight Shipping Services directly from one or more of the Airfreight Carrier Named Co-Conspirators for shipments between the U.S. and the rest of the world and has suffered pecuniary injury as a result of the antitrust violations alleged herein.

## DEFENDANT

25.     Bruce McCaffrey ("McCaffrey" or "Defendant") was Vice President of Freight, the Americas, for Qantas Airways Limited ("Qantas") during the Class Period. Qantas is a Named Co-Conspirator. McCaffrey participated in the conspiracy alleged herein from at least January 1, 2000 until at least February 14, 2006. McCaffrey had knowledge of the actions of

Qantas set forth below, approved of them and participated in them. On July 28, 2008, McCaffrey pled guilty to a criminal information brought by the United States charging that, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, he participated in a combination and conspiracy to suppress and eliminate competition by fixing the base rates and Surcharges charged to Airfreight Customers in the United States and elsewhere for international air shipments in violation of Sherman Act § 1. McCaffrey was sentenced to serve six months in prison and to pay a criminal fine of $20,000. On January 13, 2010, McCaffrey was ordered to surrender himself to the Bureau of Prisons by reporting to Devens Federal Medical Center in Devens, Massachusetts by 2:00 p.m. on January 20, 2010.

## NAMED CO-CONSPIRATORS

26. China Airlines Ltd. ("CAL") is a foreign company with its headquarters located at No. 131, Sec. 3, Nanjing E. Road, Taipei City 104, Taiwan. CAL conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. CAL maintains an office at 633 Third Avenue, 8th Floor, Suite 800, New York, New York 10017.

27. EVA Airways Corporation ("EVA") is a foreign company with its headquarters located at EVA Air Building, 376 Hsin-Nan Road, Luchu Hsiang, Taiwan. EVA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. EVA maintains an office at 100 Town Square Place, Suite 310, Jersey City, New Jersey 07310.

28. Malaysia Airlines ("Malaysia Air") is a foreign company with its headquarters located at Bangunan MAS, 33rd Floor, Jalan Sultan Ismail 50250, Kuala Lumpur, Malaysia. Malaysia Air conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. Malaysia Air maintains an office at 100 North Sepulveda Boulevard, Suite 1710, El Segundo, California 90245.

29.     Air India ("Air India") is a foreign company with its headquarters located at Air India Building, Nariman Point, Mumbai 400 021, India. Air India conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. Air India maintains an office at 570 Lexington Avenue, 15th Floor, New York, New York 10022.

30.     Jean Charles Foucault ("Foucault") was Vice President of Sales and Marketing for Société Air France during the class period. Société Air France is a Named Co-Conspirator. Foucalt had knowledge of the actions of Société Air France set forth below and approved of them and participated in them. Foucault's participation in the conspiracy alleged herein included his attendance at a May 2004 meeting with other co-conspirators, including representatives of KLM, Emirates and Lufthansa at the Plaza Hotel Oak Bar in New York City, New York. During that meeting the attendees discussed their mutual intentions not to offer, and reached agreement not to offer, discounts to freight forwarder customers on air cargo surcharges.

31.     Bram Graber ("Graber") served as Vice President, Business Air Cargo, Senior Vice President, Commercial, and Senior Vice President, Marketing and Network, for Koninklijke Luchtvaart Maatschappij N.V. ("KLM") during the class period. KLM is a Named Co-Conspirator. Graber had knowledge of the actions of KLM set forth below and approved of them and participated in them. Graber's participation in the conspiracy alleged herein included his attendance, on behalf of KLM, at a May 2004 meeting with other co-conspirators, including representatives of Société Air France, Emirates and Lufthansa at the Plaza Hotel Oak Bar in New York City, New York. During that meeting the attendees discussed their mutual intentions not to offer, and reached agreement not to offer, discounts to freight forwarder customers on air cargo surcharges.

32. Franciscus Johannes de Jong a/k/a Frank de Jong ("de Jong") was Vice President of Cargo Sales in Europe of Martinair Holland N.V. ("Martinair") during the Class Period. Martinair is a Named Co-Conspirator. De Jong had knowledge of the actions of Martinair set forth below, approved of them and participated in them. As set forth below, de Jong has pled guilty to criminal charges that he participated in the conspiracy alleged herein.

33. Jan Lillieborg ("Lillieborg") was Vice President of Global Sales of SAS Cargo Group A/S ("SAS Cargo") during the class period. SAS Cargo is a Named Co-Conspirator. Lillieborg had knowledge of the actions of SAS Cargo set forth below, approved of them and participated in them. Lillieborg's participation in the conspiracy alleged herein included his attendance at meetings with representatives of other air carrier co-conspirators in New York, New York in April 2003 and September 2004 during which prospective increases of surcharges to be charged customers for air cargo shipments to and from the United States were discussed and agreed upon and during which agreements to refrain from competing for one another's air cargo customers were reached.

34. Jean Paul Moreau ("Moreau") was Director of Sales for Société Air France during the class period. Société Air France is a Named Co-Conspirator. Moreau had knowledge of the actions of Air France set forth below and approved of them and participated in them. Moreau's participation in the conspiracy alleged herein included his attendance, on behalf of Société Air France, at a May 2004 meeting with other co-conspirators, including representatives of KLM, Emirates and Lufthansa at the Plaza Hotel Oak Bar in New York City, New York. During that meeting the attendees discussed their mutual intentions not to offer, and reached agreement not to offer, discounts to freight forwarder customers on air cargo surcharges.

35.     Keith H. Packer ("Packer"), from 2001 through 2003, was Senior Manager of Sales and Marketing and a member of the British Airways PLC ("British Airways") Cargo Leadership Team and, from 2004 and thereafter during the Class Period, was Commercial General Manager of British Airways.  British Airways is a Named Co-Conspirator.  Packer had knowledge of the actions of British Airways set forth below, approved of them and participated in them.  As set forth below, Packer has pled guilty to criminal charges that he participated in the conspiracy alleged herein.

36.     Salvatore Sanfilippo ("Sanfilippo") served as Regional Manager for Cargo for the Americas for Air New Zealand Limited ("Air New Zealand") from March 2001 and thereafter during the Class Period.  Air New Zealand is a Named Co-Conspirator.  Sanfilippo had knowledge of the actions of Air New Zealand set forth below, approved of them and participated in them.  Sanfilippo's participation in the conspiracy alleged herein included collusive discussions and communications during the period from at least as early as March 2001 to at least February 2006 with co-conspirators Korean Air, Qantas, Lufthansa and Polar Air during which prospective fuel surcharges and security surcharges on routes to and from the United States were discussed and agreed upon.

37.     Air Canada is a foreign company with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada.  Air Canada conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

38.     AC Cargo LP ("AC Cargo") is a foreign company with its headquarters located at 5100 de Maisonneuve Boulevard West, Montreal, Quebec H4A 3T2, Canada.  AC Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this

district.  At all relevant times, Air Canada owned, dominated and controlled the businesses of AC Cargo.

      39.     Air Canada and AC Cargo are collectively referred to herein as "Air Canada."

      40.     Société Air France is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France.  Société Air France conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

      41.     KLM is a foreign company with its headquarters located at 45, rue de Paris 95747 Roissy-CDG Cedex, France.  KLM conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

      42.     Société Air France and KLM are collectively referred to herein as "Air France."

      43.     Aerolíneas Brasileiras S.A. d/b/a ABSA Cargo Airline ("ABSA") is a foreign company with its headquarters located at Aeroporto Internacional de Viracopos, Rodovia Santos Dumont, Km 66 - Sistema Viário Principal s/n, 1305 1- 970 Campinas São Paulo, Brazil.  ABSA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  ABSA has a strategic alliance with LAN Cargo S.A. (LAN Airlines S.A. owns 73 percent of ABSA) and maintains a code-share agreement with Lufthansa Cargo to and from Frankfurt.

      44.     Alitalia Linee Aeree Italiane S.p.A. ("Alitalia") was a foreign company with its headquarters located at Viale Alessandro Marchetti, 11100148 Rome, Italy.  During the Class Period, Alitalia conducted Airfreight Shipping Services throughout the world, including in the U.S. and this district.

45.     All Nippon Airways Co., Ltd. ("ANA") is a foreign company with its headquarters located at Shiodome City Center, 1-5-2 Higashi-Shimbashi, Minatoku, Tokyo 105-7 133, Japan.  ANA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  Until 2005 ANA owned at least 25 percent of Nippon Cargo Airlines.

46.     Asiana Airlines Inc. ("Asiana Airlines") is a foreign company with its headquarters located at Asiana Town, 47 Osoe-dong, Gangseo-gu, Seoul, South Korea.  Asiana conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

47.     British Airways is a foreign company with its headquarters located at Waterside, UB7 GB Harmondsworth, Middlesex, England.  British Airways conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. British Airways' cargo division is named British Airways World Cargo.

48.     Cargolux Airlines International S.A. ("Cargolux") is a foreign company with its headquarters located at Luxembourg Airport L-2990, Luxembourg, Grand Duchy of Luxembourg.  Cargolux conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

49.     Cathay Pacific Airways Ltd. ("Cathay Pacific") is a foreign company with its headquarters located at Hong Kong International Airport, 7/F North Tower, 8 Scenic Road, Cathay City, Lantau, Hong Kong.  Cathay Pacific conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

50.     Air China Limited d/b/a Air China is a foreign company with its headquarters located at 46 Xiaoyun Road, Beijing 100027, People's Republic of China.  Air China

Limited conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

51.    Air China Cargo Company Limited d/b/a Air China Cargo ("Air China Cargo") is a foreign company with its headquarters located at 46 Xiaoyun Road, Beijing 100027, People's Republic of China, and a subsidiary of Air China Limited.  Air China Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  Air China Limited is the majority shareholder in Air China Cargo, and, at all relevant times, Air China Limited owned, dominated and controlled the business of Air China Cargo.

52.    Air China Limited and Air China Cargo are collectively referred to herein as "Air China."

53.    DAS Air Ltd. d/b/a DAS Air Cargo ("DAS") was a foreign company with its headquarters located at Unit 1 Tilgate Forest Business Centre, Elm Park Court, Brighton Road, Crawley, West Sussex RH1 1 9BP, United Kingdom.  During the Class Period, DAS conducted Airfreight Shipping Services throughout the world, including in the U.S. and this district.

54.    Deutsche Lufthansa AG ("Lufthansa AG") is a foreign company with its headquarters located at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany.  Lufthansa AG conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

55.    Lufthansa Cargo is a foreign company with its headquarters located at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany.  Lufthansa Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  Lufthansa Cargo is a

subsidiary of Lufthansa AG. At all relevant times, Lufthansa AG owned, dominated and controlled the business of Lufthansa Cargo.

56. Swiss International Air Lines Ltd. ("Swiss International") is a foreign company and a wholly-owned subsidiary of Lufthansa AG with its headquarters located at Aeschenvorstadt 4, CH-405 1 Basel, Switzerland. Swiss International conducts Airfreight Shipping Services throughout the world, including in the United States and this district.

57. Lufthansa AG, Lufthansa Cargo and Swiss International are collectively referred to herein as "Lufthansa."

58. El Al Israel Airlines, Ltd. ("El Al") is a foreign company with its headquarters located at Ben Gurion International Airport, P.O. Box 41, Lod 70100, Israel. El Al conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

59. Emirates Airlines d/b/a Emirates ("Emirates") is a foreign company with its headquarters located at Ground Floor, Dubai Airline Centre Building, Dubai, United Arab Emirates. Emirates conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

60. Japan Airlines International Company Ltd. ("JAL") is a foreign company with its headquarters located at 4-11, Higashi-shinagawa 2-chome, Shinagawaku, Tokyo 140-8637, Japan. JAL conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. JAL's cargo division is named JAL Cargo.

61. Korean Air Lines Co. Ltd. ("Korean Air") is a foreign company with its headquarters located at 1370 Gonghang-Dong, Gangso-Gu, Seoul, Korea. Korean Air conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

62.     LAN Airlines S.A. is a foreign company with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile.  LAN Airlines S.A. conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

63.     LAN Cargo S.A. ("LAN Cargo") is a foreign company with its headquarters located at Presidente Riesco 5711 Piso 20, Las Condes, Santiago, Chile.  LAN Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  LAN Cargo is a wholly owned subsidiary of LAN Airlines S.A.  At all relevant times, LAN Airlines S.A. owned, dominated and controlled the business of LAN Cargo.

64.     LAN Airlines S.A. and LAN Cargo are collectively referred to herein as "LAN."

65.     Martinair is a foreign company with its headquarters located at Havenmeesterweg 201, Schiphol Airport, 1118 ZG Amsterdam, The Netherlands.  Martinair conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. KLM owns 50 percent of Martinair.

66.     Air New Zealand Limited d/b/a Airways New Zealand is a foreign company with its headquarters located at 44-48 Willis Street, Wellington, New Zealand.  Air New Zealand conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

67.     Nippon Cargo Airlines Co., Ltd. ("NCA") is a foreign company with its headquarters located at Shiodome City Center 8F 5-2, Higashi-Shinbashi, 1- Chome, Minato-Ku, Tokyo 105-7 108, Japan.  NCA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

68. Atlas Air Worldwide Holdings, Inc. ("Atlas") is a domestic U.S. company with its headquarters located at 2000 Westchester Avenue, Purchase, New York 10577. Atlas conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

69. Polar Air Cargo, Inc. ("Polar Cargo") is a domestic U.S. company with its headquarters located at 2000 Westchester Avenue, Purchase, New York 10577. Polar Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district. Polar Cargo is a wholly owned subsidiary of Atlas. At all relevant times, Atlas owned, dominated and controlled the business of Polar Cargo.

70. Atlas and Polar Cargo are collectively referred to herein as "Polar Air."

71. Qantas is a foreign company with its headquarters located at Qantas Centre, 203 Coward Street, Mascot, New South Wales 2020. Qantas conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

72. Saudi Arabian Airlines, Ltd. ("Arabian") is a foreign company with its headquarters located at P.O. Box 167, Jeddah 21231, Kingdom of Saudi Arabia. Arabian conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

73. Scandinavian Airlines System Group ("SAS Group") is a foreign company with its headquarters located at Frösundaviks Allé 1, 195 87 Stockholm, Sweden. SAS conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

74. SAS Cargo is a foreign company with its headquarters located at Petersdalvej 1, DK-2770 Kastrup, Denmark. At all relevant times, SAS Cargo has conducted Airfreight Shipping Services throughout the world, including in the United States and this district. SAS Cargo is a wholly owned subsidiary of SAS Group. At all relevant times, SAS Group owned, dominated and controlled the business of SAS Cargo.

75.    SAS Group and SAS Cargo are collectively referred to herein as "SAS."

76.    Singapore Airlines Limited is a foreign company with its headquarters located at Airline House, 25 Airline Road, Singapore 819829.  Singapore Airlines Limited conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

77.    Singapore Airlines Cargo Pte Ltd ("SIA Cargo") is a foreign with its headquarters located at 5th floor core L, SATS Airfreight Terminal 5, Superhub 1, 30 Airline Road, Singapore 819830.  SIA Cargo conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.  SIA Cargo is a wholly owned subsidiary of Singapore Airlines Limited.  At all relevant times, Singapore Airlines Limited owned, dominated and controlled the business of SIA Cargo.

78.    Singapore Airlines Limited and SIA Cargo are collectively referred to herein as "Singapore Air."

79.    South African Airways (Proprietary) Limited ("SAA") is a foreign company with its headquarters located at Airway Park, Jones Road, Johannesburg International Airport, Kempton Park, Johannesburg, 1627, South Africa.  SAA conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

80.    Thai Airways International Public Co., Ltd. ("Thai") is a foreign company with its headquarters located at 89 Vibhavadi-Rangsit Rd. Bangkok, 10900, Thailand.  Thai conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

81.    Viação Aérea Rio-Grandense, S.A. ("VARIG") is a foreign company with its headquarters located at Rua 18 de Novembro No. 800, São João, 90240-040 Porto Alegre, Rio

Grande do Sul, Brazil. VARIG conducts Airfreight Shipping Services throughout the world, including in the U.S. and this district.

## UNNAMED CO-CONSPIRATORS

82. At all relevant times, other Airfreight Carriers, trade groups, or other entities, as well as various other persons, companies, and corporations, willingly conspired with the Defendant and the Named Co-Conspirators in their unlawful restraint of trade.

83. The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators or ordered or done by duly authorized officers, managers, agents, employees, or representatives of each co-conspirator while actively engaged in the management, direction or control of its affairs.

84. At all relevant times, the Airfreight Carrier Named Co-Conspirators and certain unnamed co-conspirators were Airfreight Carriers that charged rates, Surcharges and other fees for Airfreight Shipping Services to Airfreight Customers in the United States and throughout the world.

85. As further alleged herein, during at least the Class Period, the Defendant and his co-conspirators agreed, combined, and conspired with each other to fix, raise, maintain, or stabilize the prices of Airfreight Shipping Services by, *inter alia*, levying concerted and artificially inflated Surcharges, jointly agreeing to eliminate or prevent discounting of prices of Airfreight Shipping Services, agreeing on Yields, and allocating customers, routes, or territories. As a result of the Defendant's and his co-conspirators' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high prices for Airfreight Shipping Services and have been damaged thereby.

17

## AGENTS

86.     The acts alleged to have been done by any Airfreight Carrier Named Co-Conspirator or any other named or unnamed Air Carrier co-conspirator were authorized, ordered or done by its directors, officers, managers, agents, employees, or representatives while actively engaged in the management of the Airfreight Carrier's affairs.  To the extent they performed acts during the course of and in furtherance of the conspiracy alleged herein, the named and unnamed co-conspirators and Defendant have acted as one another's agents.

## AMNESTY RECIPIENTS

87.     The U.S. Department of Justice ("DOJ") has "a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions."

88.     On or before December 31, 2005, Lufthansa made an application under the DOJ's corporate leniency policy on behalf of Lufthansa, and any subsidiaries, to report price-fixing activity and other conduct potentially violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the air cargo industry in the United States and elsewhere.

89.     Based on their report to the DOJ and consistent with and pursuant to the DOJ leniency policy, Lufthansa was accepted into the leniency program and extended full federal government immunity for the reported price-fixing activities.

## GUILTY PLEAS

90.     To date, fifteen Airfreight Carrier Named Co-Conspirators have pled guilty to participating in a conspiracy among providers of Airfreight Shipping Services to fix one or more component of cargo rates in violation of Section 1 of the Sherman Act.  Four individuals who were executives of Airfreight Carrier Named Co-Conspirators have also pled guilty criminally to

participating in a conspiracy among providers of Airfreight Shipping Services to fix one or more

component of cargo rates in violation of Section 1 of the Sherman Act.

**Air France**

91.     On July 22, 2008, Air France pled guilty to a criminal information brought by the

United States charging that, from on or about May 15, 2001, and continuing until February 2006,

Société Air France and KLM joined and participated in a combination and conspiracy with other

Airfreight Carriers to suppress and eliminate competition by fixing the base rates, Surcharges

and fees charged to Airfreight Customers for international air shipments, including to and from

the United States, from at least as early as January 1, 2000, and continuing until at least February

14, 2006, in violation of Sherman Act § 1.  Pursuant to their plea agreement, Air France agreed

and were sentenced to jointly pay a criminal fine of $350 million, $210 million for Société Air

France and $140 million for KLM, and to provide continuing cooperation to the DOJ in its

ongoing investigation of the air cargo price-fixing conspiracy.

**Asiana Airlines**

92.     On May 5, 2009, Asiana Airlines pled guilty to a criminal information brought by

the United States charging that, from at least as early as January 1, 2000, and continuing until at

least February 14, 2006, Asiana Airlines entered into and engaged in a combination and

conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the

base rates, Surcharges and fees charged to Airfreight Customers for international air shipments,

including to and from the United States, in violation of Sherman Act § 1, and that, from at least

as early as January 1, 2000, and continuing until at least July 16, 2006, Asiana Airlines entered

into and engaged in a combination and conspiracy to suppress and eliminate competition by

fixing wholesale and passenger fares charged for flights from the United States to Korea in

violation of Sherman Act § 1.  Pursuant to its plea agreement, Asiana Airlines agreed and was sentenced to pay a criminal fine of $50 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**British Airways**

93.     On August 23, 2007, British Airways pled guilty to a criminal information brought by the United States charging that, from at least as early as March 2002 until at least February 14, 2006, British Airways joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to Airfreight Customers for international air shipments, including to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1, and that, from in or about August 2004 until at least February 14, 2006, British Airways entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the passenger fuel surcharge charged to passengers for long-haul international air transportation, including between the United States and the United Kingdom in violation of Sherman Act § 1.  Pursuant to its plea agreement, British Airways agreed and was sentenced to pay a criminal fine of $200 million relating to the air cargo conspiracy and $100 million relating to the air passenger conspiracy and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**Cargolux**

94.     On May 12, 2009, Cargolux pled guilty to a criminal information brought by the United States charging that, from at least as early as late September 2001 and continuing until at least February 14, 2006, Cargolux joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates,

Surcharges and fees charged to Airfreight Customers for international air shipments, including to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1. Pursuant to its plea agreement, Cargolux agreed and was sentenced to pay a criminal fine of $119 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**Cathay Pacific**

95.     On July 22, 2008, Cathay Pacific pled guilty to a criminal information brought by the United States charging that, from at least as early as May 1, 2002, and continuing until at least February 14, 2006, Cathay Pacific joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to Airfreight Customers for international air shipments, including to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1. Pursuant to its plea agreement, Cathay Pacific agreed and was sentenced to pay a criminal fine of $60 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**de Jong**

96.     On June 26, 2009, de Jong of Martinair pled guilty to a criminal information brought by the United States, charging that, from at least as early as April 2002 until at least February 14, 2006, he participated in a combination and conspiracy to suppress and eliminate competition by fixing the base rates and Surcharges charged to Airfreight Customers for international air shipments, including to and from the United States, in violation of Sherman Act § 1. De Jong was sentenced to serve eight months in prison and to pay a criminal fine of $20,000.

**El Al**

97.     On February 4, 2009, El Al pled guilty to a criminal information brought by the United States charging that, from in or about January 2003 and continuing until at least February 14, 2006, El Al joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates and Surcharges charged to Airfreight Customers for international air shipments, including to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1.  Pursuant to its plea agreement, El Al agreed and was sentenced to pay a criminal fine of $15.7 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**JAL**

98.     On May 7, 2008, JAL pled guilty to a criminal information brought by the United States charging that, from on or about April 1, 2000, and continuing until at least February 14, 2006, JAL entered into and engaged in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to Airfreight Customers in the United States and elsewhere for international air shipments in violation of Sherman Act § 1.  Pursuant to its plea agreement, JAL agreed and was sentenced to pay a criminal fine of $110 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**Korean Air**

99.     On August 23, 2007, Korean Air pled guilty to a criminal information brought by the United States charging that, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, Korean Air entered into and engaged in a combination and conspiracy

with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates,

Surcharges and fees to and from the United States and elsewhere charged to Airfreight

Customers for international air shipments in violation of Sherman Act § 1 and that, from at least

as early as January 1, 2000, and continuing until at least July 16, 2006, Korean Air entered into

and engaged in a combination and conspiracy to suppress and eliminate competition by fixing

wholesale and passenger fares charged for flights from the United States to Korea in violation of

Sherman Act § 1.  Pursuant to its plea agreement, Korean Air agreed and was sentenced to pay a

criminal fine of $300 million and to provide continuing cooperation to the DOJ in its ongoing

investigation of the air cargo price-fixing conspiracy.

**LAN Cargo and ABSA**

100.    On February 19, 2009, LAN Cargo and ABSA pled guilty to a criminal

information brought by the United States charging that, from in or about February 2003 and

continuing until at least February 14, 2006,  LAN Cargo and ABSA joined and participated in a

combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition

by fixing the base rates and Surcharges charged to Airfreight Customers for international air

shipments, including to and from the United States, from at least as early as January 1, 2000, and

continuing until at least February 14, 2006, in violation of Sherman Act § 1.  Pursuant to their

plea agreement, LAN Cargo and ABSA agreed and were sentenced to jointly pay a criminal fine

of $109 million, $88 million for LAN Cargo and $21 million for ABSA, and to provide

continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing

conspiracy.

**Martinair**

101.    On July 22, 2008, Martinair pled guilty to a criminal information brought by the United States charging that, from at least as early as late September 2001 and continuing until at least February 14, 2006, Martinair joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates and Surcharges charged to Airfreight Customers for international air shipments, including to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1.  Pursuant to its plea agreement, Martinair agreed and was sentenced to pay a criminal fine of $42 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**McCaffrey**

102.    On July 28, 2008, McCaffrey of Qantas pled guilty to a criminal information brought by the United States charging that, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, he participated in a combination and conspiracy to suppress and eliminate competition by fixing the base rates and Surcharges charged to Airfreight Customers in the United States and elsewhere for international air shipments in violation of Sherman Act § 1.  McCaffrey was sentenced to serve six months in prison and to pay a criminal fine of $20,000.

**NCA**

103.    On May 8, 2009, NCA pled guilty to a criminal information brought by the United States charging that NCA joined and participated in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to Airfreight Customers in the United States and elsewhere for

international air shipments from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1.  Pursuant to its plea agreement, NCA agreed and was sentenced to pay a criminal fine of $45 million and to provide continuing cooperation to the DOJ in its ongoing investigation of the air cargo price-fixing conspiracy.

**Packer**

104.    On November 21, 2008, Packer of British Airways pled guilty to a criminal information brought by the United States charging that, from at least as early as March 2002 until at least February 14, 2006, he participated in a combination and conspiracy to suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to Airfreight Customers for international air shipments, including shipments to and from the United States, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in violation of Sherman Act § 1.  Packer was sentenced to serve eight months in prison and to pay a criminal fine of $20,000.

**Qantas**

105.    On January 14, 2008, Qantas pled guilty to a criminal information brought by the United States charging that Qantas, from at least as early as January 1, 2000, and continuing until at least February 14, 2006, entered into and engaged in a combination and conspiracy with other Airfreight Carriers to suppress and eliminate competition by fixing the base rates and Surcharges to and from the United States and elsewhere charged to Airfreight Customers for international air shipments in violation of Sherman Act § 1.  Pursuant to its plea agreement, Qantas agreed and was sentenced to pay a criminal fine of $61 million and to provide continuing cooperation to the DOJ in its investigation of the air cargo price-fixing conspiracy.

**SAS**

106.    On July 21, 2008, SAS pled guilty to a criminal information brought by the

United States charging that, from in or about February 2002 until at least February 14, 2006,

SAS joined and participated in a combination and conspiracy with other Airfreight Carriers to

suppress and eliminate competition by fixing the base rates, Surcharges and fees charged to

Airfreight Customers for international air shipments, including to and from the United States,

from at least as early as January 1, 2000, and continuing until at least February 14, 2006, in

violation of Sherman Act § 1.  Pursuant to its plea agreement, SAS agreed and was sentenced to

pay a criminal fine of $52 million and to provide continuing cooperation to the DOJ in its

ongoing investigation of the air cargo price-fixing conspiracy.

**INDICTED NAMED CO-CONSPIRATOR**

107.    On August 12, 2009, the United States indicted Lillieborg for participating in a

conspiracy to suppress and eliminate competition by allocating customers and by coordinating

increases in certain Surcharges charged to Airfreight Customers located in the United States and

elsewhere for international air shipments to and from the United States, which conspiracy

Lillieborg joined and participated in from at least February 2002 until at least February 2006.

The United States charged that, among other things, Lillieborg and his co-conspirators

participated in meetings, conversations and communications in the United States and elsewhere,

including meetings in Cologne, Germany, in February 2002, and in New York, New York, in

April 2003 and September 2004, to allocate customers and to discuss prospective increases in

certain Surcharges for shipments to and from the United States; agreed during such meetings,

conversations and communications to refrain from competing for one another's customers;

coordinated certain Surcharges to be imposed; issued announcements of increases in certain

Surcharges in accordance with the agreements reached; and levied certain Surcharges to and from the United States in accordance with the agreements reached.

## INTERSTATE AND INTERNATIONAL TRADE AND COMMERCE

108.     The global Airfreight Shipping Services industry involved $50 billion of business in 2005, the last full year of the Cartel.  Approximately $19 billion of this commerce involved shipments to and from North America.

109.     At all relevant times, Airfreight Carrier Named Co-Conspirators, including Air New Zealand, where the Defendant served as Regional Manager for Cargo for the Americas during the Class Period, sold Airfreight Shipping Services in a continuous and uninterrupted flow of interstate and foreign commerce throughout the United States and the world.  Defendant and his co-conspirators received payment for such services across state and national boundaries. Defendant's and co-conspirators' activities, and the sale of the Airfreight Carriers' services, have taken place within, and have had a direct, substantial, and reasonably foreseeable anticompetitive effect upon, interstate commerce within the United States and foreign commerce.

110.     At all relevant times, the Defendant and his co-conspirators sold Airfreight Shipping Services to, from and within the United States.

111.     At all relevant times, the Defendant and his co-conspirators provided the means of transporting large amounts of goods from abroad into the United States.

112.     At all relevant times, the commerce of goods imported into the United States was dependent on the Airfreight Carrier Named Co-Conspirators' transport of the goods from abroad into United States.

113.     At all relevant times, the Defendant's and co-conspirators' conspiratorial conduct was targeted directly at a channel of import trade and import commerce – the air cargo industry.

114.    At all relevant times, the Defendant's and his co-conspirators' conduct alleged herein, whereby they agreed to fix and fixed the prices of Airfreight Shipping Services to the United States, involved import commerce with foreign nations.

115.    Plaintiffs suffered injury as a result of Defendant's and his co-conspirators' conduct in agreeing to fix and fixing the prices of Airfreight Shipping Services to, from and within the United States.

116.    At all relevant times, the Airfreight Carrier Named Co-Conspirators with headquarters outside the United States have been international Airfreight Carriers who offered their services in the United States market, thereby importing into the United States the very service of providing Airfreight Shipping Services.

117.    Defendant's and his co-conspirators' agreement to fix the prices of Airfreight Shipping Services and their actual fixing of those prices had a direct, substantial and reasonably foreseeable effect on United States commerce and on import trade and commerce with the United States.

118.    Defendant's and his co-conspirators' unlawful activities, as described herein, took place within and affected the flow of interstate commerce to Airfreight Customers located in U.S. states, as well as throughout the world, other than the U.S. states in which the Defendant and his co-conspirators were located.

119.    Defendant's and his co-conspirators' unlawful activities, as described herein, and their United States effects are interdependent with their foreign effects.

## FACTUAL ALLEGATIONS

### Price-Fixing Scheme

120.     Airfreight Shipping Services are a fungible, commodity product such that Airfreight Shipping Services provided by any one Airfreight Carrier are readily substitutable for the Airfreight Shipping Services provided by any other Airfreight Carrier.  As a result, price is the primary factor driving customer choice between Airfreight Carriers.

121.     Beginning at least as early as January 1, 2000, and continuing through at least February 14, 2006, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators engaged in an ongoing conspiracy to fix, raise, maintain and/or stabilize prices of Airfreight Shipping Services.  Defendant engaged in the ongoing conspiracy to fix, raise, maintain and/or stabilize prices of Airfreight Shipping Services during the Class Period.

122.     Defendant and his co-conspirators fixed, raised, maintained and/or stabilized the prices of Airfreight Shipping Services through a number of mechanisms, including concertedly levying inflated Surcharges, jointly agreeing to eliminate or prevent discounting of Airfreight Shipping Services prices, agreeing on Yields, and allocating customers, routes, or territories.

123.     The Surcharge mechanisms, including Fuel Surcharges, Security Surcharges, War Risk Surcharges, and U.S. Customs Surcharges, were used by the Defendant and his co-conspirators to collusively increase prices.

### Fuel Surcharge

124.     Beginning in at least late December 1999, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators exchanged information regarding a

29

variety of Surcharges, including the Fuel Surcharge, in furtherance of their agreement to act in concert with one another to fix the overall prices of Airfreight Shipping Services.

125.    Generally, Surcharges are part of the price of Airfreight Shipping Services, whereby Airfreight Carriers charge extra fees to their customers, above and beyond basic freight charges typically priced by weight or volume, with the purported intent of defraying certain external costs of the Airfreight Carriers, but with the intended overall effect of increasing Airfreight Shipping prices.

126.    At the time the conspiracy commenced, many airlines had similar Fuel Surcharge pricing systems in place – some of which were published – which, if independently implemented in a competitive market, would have been the foundation for the timing and amount of upward or downward pricing movements triggered by multiple factors, including spot fuel prices.

127.    To eliminate competition in setting the Fuel Surcharge portion of Airfreight Shipping Services prices, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators combined and conspired, through secret meetings and communications, to jointly agree on the factors triggering each pricing system, the resulting price change to be implemented upon the occurrence of those factors, and the timing of that change.  These meetings, communications, and agreements ensured that the Airfreight Carrier Named Co-Conspirators would jointly act upon those triggering factors and identify and correct deviations from the terms and timing on which they collusively agreed.

128.    For example, on February 14, 2001, Korean Air hosted a meeting to discuss and agree on the coordination of Fuel Surcharges.  Participants included Cathay Pacific, Lufthansa, KLM, Malaysia Air and Singapore Air.

129.    Among other things, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators agreed on harmonization of the Fuel Surcharge; implementation of the Fuel Surcharge; extensions of the Fuel Surcharge; currency issues; capping the Fuel Surcharge (by shipment or by weight); and refusing to discount the Fuel Surcharge to freight forwarders.

130.    For example, there were regular meetings in New York at the JFK Airport Air Cargo Association attended by representatives of Air Canada, Air France, Alitalia, CAL, Cargolux, Cathay Pacific, EVA, JAL, Lufthansa, NCA, Singapore Air and Thai.  At these meetings, Fuel Surcharges were discussed and coordinated and representatives asked each other whether Airfreight Carriers planned to increase or decrease Fuel Surcharges in accordance with Lufthansa's Fuel Surcharge methodology.

131.    The Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators also implemented their agreement by privately exchanging price and cost information for the purpose of monitoring and enforcing any agreed-upon Fuel Surcharge levels and publicly announcing agreed-upon Fuel Surcharge increases in advance of their implementation in order to ensure coordination among Airfreight Carrier Named Co-Conspirators on the Fuel Surcharge levels.

132.    In 2002, the Airfreight Carrier Named Co-Conspirators jointly agreed to and initiated a four-step Fuel Surcharge increase program, where increase factors would trigger only one step per period, at $.05 increase per step, capped at the fourth step.

133.    For example, on September 19, 2002, members of the Cargo Sub-Committee for the Board of Airline Representatives in India, including Air Canada, Air France, Air India, Air New Zealand, British Airways, Cathay Pacific, El Al, Emirates, Korean Air,

Malaysia Air, Arabian, Singapore Air, SAA and Thai met at Air India's offices to coordinate Fuel Surcharges and agreed on a uniform Fuel Surcharge increase of 5 Rupees/kg, equivalent to $0.10/kg, for all general cargo effective October 1, 2002.

134.    As another example, on February 8, 2003, the President of the Airline Cargo Council of Switzerland ("ACCS"), Andre Berger of Malaysia Air, and ACCS Executive Committee member Chris Heiz of Swiss International communicated about Swiss International's then unannounced Fuel Surcharge increase plans.  On February 18, 2003, Heiz advised ACCS Executive Committee member Walter Burri of Singapore Air of an urgent Fuel Surcharge meeting.  Heiz reported to Burri that the final recommendation of Swiss International was a Fuel Surcharge increase to CHF 0.22/kg, equivalent to approximately $0.15/kg, effective March 3, 2003, for shipments from Switzerland, including to the United States.  Heiz also advised Berger, Christopher Jolley (Emirates), and Susanne Erb (KLM), all members of the ACCS Executive Committee.  The same day, ACCS President Berger advised ACCS members that there had been heavy discussion of the Fuel Surcharge and that he recommended following the home Airfreight Carriers and some main Airfreight Carriers in implementing a new Fuel Surcharge of CHF 0.22/kg for shipments from Switzerland, effective March 3, 2003.  ACCS members, including Air Canada, Air China, Air France, Air India, Arabian, Asiana Airlines, British Airways, CAL, Cargolux, Cathay Pacific, El Al, Emirates, JAL, Korean Air, LAN, Lufthansa, Malaysia Air, Martinair, SAS, Singapore Air, SAA, Thai and VARIG, complied with Berger's request and imposed identical Fuel Surcharge increases in March 2003 for shipments from Switzerland, including to the United States.

135.    By the end of 2003 or beginning of 2004, these increase factors triggered the fourth and final step of the Airfreight Carrier Named Co-Conspirators' four-step program.  Named

and unnamed co-conspirators met to jointly agree on additional steps to implement price increases in concert beyond the original four-step program.

136.    As a result, the Airfreight Carrier Named Co-Conspirators jointly imposed additional, multiple-step price increases, all at identical amounts per step.  All additional steps were preceded by multiple meetings, communications, and agreements among Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators concerning such increases.

137.    As the conspiracy progressed, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators intensified their joint meetings, communications, and agreements regarding price increases.  Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including Europe, the United States, South America and Asia.  These contacts often were initiated when one Airfreight Carrier Named Co-Conspirator's methodology suggested an increase.  At such times, the initiating Airfreight Carrier Named Co-Conspirator would contact other named and unnamed co-conspirators to seek reassurances that all Airfreight Carrier Named Co-Conspirators would adopt the same increase.  Airfreight Carrier Named Co-Conspirators also sought reassurances to apply the Fuel Surcharge increases consistently throughout all world regions.

138.    Where the Fuel Surcharges were not being applied consistently, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators often undertook corrective action in order to ensure consistent application.

139.    During this period, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators concertedly policed one another's compliance with their

joint price agreements and, among other things, secretly met and communicated about compliance with their agreements.

## Security Surcharge

140.    In addition to increasing prices of Airfreight Shipping Services through Fuel Surcharges, the Airfreight Carrier Named Co-Conspirators agreed to and did jointly increase prices through a Security Surcharge.

141.    Following the September 11 attacks, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met and communicated and jointly agreed to impose a Security Surcharge upon their Airfreight Customers, which remained in effect thereafter.  Secret meetings and communications included discussions at the highest levels of the respective companies and occurred in various venues, including Europe, the United States, and Africa.

142.    For example, on October 12, 2001, Lufthansa's Head of Marketing, Sales and Networking, Andreas Otto, apprised JAL's Juntaro Shimizu of the details of Lufthansa's Security Surcharges across all its routes and sought to persuade JAL to adopt the same Security Surcharges.  The same information was provided to the CEOs of Air China, Air France, Air New Zealand, British Airways, Cargolux, Cathay Pacific, EVA, JAL, Korean Air, SAS, Singapore Air, SAA and Thai.

143.    Named and unnamed co-conspirators jointly acted in order to facilitate agreements regarding exceptions, discounting, and caps relating to the Security Surcharge.

144.    Airfreight Carrier Named Co-Conspirators, with few exceptions, jointly implemented the agreed upon Security Surcharge worldwide.

145.    The Security Surcharge imposed by the Airfreight Carrier Named Co-Conspirators bore little or no relationship to external costs.  As of December 5, 2005, for example, the prevailing Security Surcharges were set at a uniform $0.15, regardless of differences in actual security costs for different localities.

## War Risk Surcharge

146.    Following the outbreak of the war in Iraq in 2003, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators again met, communicated, and jointly agreed to further increase prices of Airfreight Shipping Services by imposing on their Airfreight Customers another Surcharge, the War Risk Surcharge.

147.    Secret joint meetings, communications, and agreements specifically addressed Airfreight Carrier Named Co-Conspirators' agreements concerning, and implementation of, the War Risk Surcharge.

148.    For example, on March 20, 2003, Singapore Air informed British Airways, Air France, CAL, Cargolux, Cathay Pacific, Emirates, Martinair and Lufthansa that Singapore Air would impose a War Risk Surcharge and requested the other Airfreight Carriers to advise it whether they intended to do the same, so that all Airfreight Carriers could collectively impose the War Risk Surcharge.

149.    The War Risk Surcharge was terminated by the Airfreight Carrier Named Co-Conspirators approximately one month after its implementation.

## U.S. Customs Surcharge

150.    Beginning around late 2003, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met, communicated and jointly agreed to further increase prices of Airfreight Shipping Services through a U.S. Customs Surcharge.

151.    Since August 2004, Airfreight Carriers have been required to prepare and submit to U.S. Customs a manifest of all goods that the carrier will offload in the United States.  This manifest, originating from the Airfreight Customer, must be received by the Airfreight Carrier and then submitted electronically to U.S. Customs by the Airfreight Carrier before its airplane enters United States airspace.

152.    Beginning around late 2003, the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators secretly met, communicated and jointly agreed to charge uniform flat fees to Airfreight Customers for each Airfreight Carrier Named Co-Conspirator's preparation and submission of these manifests.  These secret meetings and discussions occurred in Europe, Asia and elsewhere.  The Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators concertedly agreed that they would charge Airfreight Customers a flat fee of 8 Euros per manifest received from the Airfreight Customer in a manual or paper format and 2 Euros per manifest received in electronic format.

153.    These U.S. Custom Surcharges bore no relationship to actual additional costs incurred by the Airfreight Carriers to comply with United States Customs manifest requirements, and any costs incurred would not have been virtually uniform among the Airfreight Carriers, much less in virtually uniform ratios for electronic and paper manifests.

154.    These U.S. Customs Surcharges were jointly implemented by Airfreight Carrier Named Co-Conspirators beginning in August 2004 and continued thereafter.

### Concerted Refusal to Discount

155.    Airfreight Carriers historically and typically allow freight forwarders a discount on Airfreight Shipping Services secured by the freight forwarder.

156.    During the Class Period, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met, communicated and jointly agreed to increase Airfreight Shipping Services prices by concertedly refusing to pay certain discounts to freight forwarders with respect to Airfreight Shipping Services.

157.    For example, at a July 28, 2005 meeting of the Cargo Sub-Committee for the Board of Airline Representatives in Singapore, chaired by Singapore Air's Clinton Tan and attended by representatives of Air New Zealand, CAL, Cargolux, JAL, Malaysia Air, NCA, Swiss International and Thai, the attendees agreed that they would not pay freight forwarders discounts on Fuel Surcharges.

158.    As a result of these secret meetings and communications, Airfreight Carrier Named Co-Conspirators collusively agreed to refuse to provide discounts to freight forwarders with respect to the Surcharges on Airfreight Shipping Services.

## Concerted Increases in Yields

159.    Data available to all Airfreight Carriers show Yields for the industry as a whole.

160.    In furtherance of their Agreement, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators privately exchanged individual Airfreight Carriers' Yields.

161.    During the Class Period, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met, discussed and jointly agreed to concertedly increase the Airfreight Carrier Named Co-Conspirators' Yields on Airfreight Shipping Services.

**Allocation of Customers**

162.    During the Class Period, Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met, communicated and jointly agreed to increase, maintain or stabilize Airfreight Shipping Services prices by allocating their Airfreight Customers where necessary in order to minimize a customers' ability to access competitive rates.

163.    In furtherance of their conspiracy to increase Air Shipping Services prices during the Class Period, Airfreight Carrier Named Co-Conspirators, at times, jointly and secretly agreed to and did refrain from pursuing and/or acquiring each others' customers.

**Intent**

164.    All of Defendant's wrongful acts complained of herein were done knowingly, intentionally, purposefully, and willfully, and were carried out with knowledge of and willful disregard of the rights of Plaintiffs and the Class they represent, in a calculating fashion and/or with the expectation of profiting therefrom in an amount exceeding the amounts payable by them to Plaintiffs and the Class as a result of such wrongful actions.

**FRAUDULENT CONCEALMENT**

165.    Throughout the Class Period, the Defendant and his co-conspirators affirmatively and fraudulently concealed their unlawful conduct against Plaintiffs and the Class.

166.    Plaintiffs and members of the Class did not discover and could not have discovered, through the exercise of reasonable diligence, which they in fact exercised, the existence of the conspiracy and the Defendant's and his co-conspirators' involvement in the conspiracy alleged herein until after February 14, 2006, when the investigations by the U.S. Department of Justice and other foreign antitrust regulators first became public and until after

Lufthansa provided information to Plaintiffs in late April 2008, because the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators actively and fraudulently concealed the existence of their conspiracy.

167.    Because the conspiracy was actively concealed until February 14, 2006, Plaintiffs and members of the Class were unaware of Defendant's and his co-conspirators' unlawful conduct alleged herein and did not know that they were paying artificially high prices for Airfreight Shipping Services.

168.    The affirmative acts of the Defendant and his co-conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

169.    The Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators agreed among themselves not to discuss publicly or otherwise reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

170.    The Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators met and communicated secretly concerning the pricing and marketing of Airfreight Shipping Services so as to avoid detection.

171.    By its very nature, the price-fixing conspiracy was inherently self-concealing.

172.    The Airfreight Carrier Named Co-Conspirators gave false and pretextual reasons for their Surcharges during the Class Period.

173.    Each of the Airfreight Carrier Named Co-Conspirators' Surcharge announcements during the Class Period constituted implicit statements that the Surcharges in question were legitimate and the result of legitimate competitive market forces.  Surcharges for Airfreight Shipping Services before the Class Period had occurred and were publicly reported

in press releases, news wire services, trade publications, and newspapers.  Plaintiffs were thus conditioned by experience in dealing with Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators in what Plaintiffs believed to be a competitive industry to expect such Surcharges from time to time.  However, any Surcharge that was openly collusive would not have been tolerated by Plaintiffs.

174.    The Surcharges in question announced by Airfreight Carrier Named Co-Conspirators and reported in public sources were consistently ascribed by named and unnamed co-conspirators and others to normal market forces and considerations, including increases in costs.  Plaintiffs and members of the Class did not have and could not have had contemporaneous access to sufficient information regarding Airfreight Carriers' costs and thus had to rely on the truthfulness of Airfreight Carrier Named Co-Conspirators' purported cost justifications.

175.    As an example, JAL Cargo posted on its website an explanation of Fuel Surcharges and Security Surcharges (what it called Insurance Surcharges) that attributed them solely to rising costs and did not disclose that they were set collusively.  The current version of this web page is found at http://www.jal.co.jp/en/other/info2006_0714.html.

176.    Similarly, Cargolux's website has a page tying fuel Surcharges to upward or downward fuel costs, which does not disclose the conspiratorial nature of the mechanism for setting the Surcharges.  The current version of this web page is found at http://www.cargolux.com/services/surcharges_details.php.

177.    Likewise, SAS Cargo attributed Security Surcharges primarily to cost factors without identifying the conspiracy relating to it.  The current version of its website devoted to this topic is found at http://www.sascargo.com/default.asp?NavID=2272.

178.    At its website, British Airways has also attributed Fuel Surcharges to cost factors, with no reference to its collusive activities.  The current web page on this topic is found at http://www.baworldcargo.com/surcharges/.

179.    KLM and Société Air France have issued press releases during the Class Period announcing Fuel Surcharge increases purportedly on the basis of rising costs; in none of these was the collusive mechanism used to set those Surcharges disclosed.  Examples can be found at http://www.klmcargo.com/tds/frameset.jsp?http&&&www.klmcargo.com/tds//newspage/ news/KLMCargoadaptsfuelsurchargemechanismandincreasesfuelsurchargetoEuro035.jsp ?ComponentID=5 85 83&SourcePageID=9062>, http:// www.airfranceklm- finance.com/sysmodules/RBS_fichier/admin/forcedownload.php?id=375 -, and www.af- klm.com/cargo/b2b/cargo_en/images/FSC%20AFKL%20- %200,50%20English_060 13 1_tcm230-4 1 568.pdf >.

180.    Similar pretextual announcements have been made during the Class Period by Airfreight Carrier Named Co-Conspirators, including Singapore Airlines (http://www.findarticles.com/p/articles/mi_m0CWU/is_2005_July_8/ai_n1 4729796), Alitalia (http://www.rte.ie/business/2005/07 11 /altalia.html), ANA (http://www.finanznachrichten.de/nachrichten-2006-09/artikel-692752 1 .asp), and Lufthansa (http://findarticles.com/p/articles/mi_m0CWU/is_2005_Sept_1 6/ai_n1 5397423).

181.    These are only a few examples among many.  Other Airfreight Carrier Named Co-Conspirators made misleading announcements of the same type during the Class Period.

182.    These false or misleading explanations for Surcharges lulled Plaintiffs and members of the Class into believing that increases were the normal result of competitive market forces rather than the product of collusive efforts.  Airfreight Carrier Named Co-

Conspirators' and other named and unnamed co-conspirators' statements to the media, to customers, and to analysts about the reasons for such Surcharges were designed to, and did, put Plaintiffs and members of the Class off guard and cause them to accept the increases without undertaking further inquiry. Even had such inquiry been undertaken, it would have proven futile, because Plaintiffs and members of the Class did not have access to contemporaneous information that would have allowed them to evaluate whether each Airfreight Carrier Named Co-Conspirator's claimed justifications for Surcharges were valid.

183.    At the time, Plaintiffs and members of the Class considered Airfreight Carrier Named Co-Conspirators' articulated reasons for their Surcharges during the Class Period to be both normal and legitimate. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of the Airfreight Carrier Named Co-Conspirators' Surcharges.

184.    Plaintiffs and members of the Class could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The conspiracy as herein alleged was fraudulently concealed by various means and methods, including, but not limited to, secret meetings, misrepresentations to customers concerning the reason for price increases and surreptitious communications among named and unnamed co-conspirators by the use of the telephone or in-person meetings at trade association gatherings and elsewhere in order to prevent the existence of written records.

185.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators until February 14, 2006, Plaintiffs and the members of the Class had no knowledge of the alleged conspiracy, or of any facts or information which would have caused a reasonably diligent person to investigate whether a conspiracy existed.

186.    None of the facts or information available to Plaintiffs and members of the Class prior to February 14, 2006, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to February 14, 2006.

187.    As a result of the Defendant's and his co-conspirators' fraudulent concealment of their conspiracy, the running of any statue of limitations has been tolled with respect to any claims of Plaintiffs and members of the Class as a result of the anticompetitive conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

188.    Plaintiffs bring this action on their own behalf and as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All persons and entities (excluding governmental entities, Defendants, Named Co-Conspirators and Defendants' and Named Co-Conspirators' respective predecessors, subsidiaries, affiliates, and business partners) that purchased Airfreight Shipping Services for shipments within, to, or from the United States directly from any of the Defendants or Named Co-Conspirators or from any predecessor, subsidiary, or affiliate of any Defendant or named Co-Conspirator, at any time during the period from no later than January 1, 2000, to September 11, 2006.

189.    Because such information is in the exclusive control of the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators, Plaintiffs do not know the exact number of the members of the Class.  Due to the nature of the trade and commerce involved, however, Plaintiffs believe that the members of the Class number at least in the

thousands and are sufficiently numerous and geographically dispersed throughout the United States and the world so that joinder of all members of the Class is impracticable.

190.    There are questions of law or fact common to the Class which will predominate over any questions that may affect only individual members, including:

a.    whether the Defendant and his co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, and/or stabilize Airfreight Shipping Services prices charged in the United States and throughout the world;

b.    whether the Defendant and his co-conspirators violated Section 1 of the Sherman Act;

c.    the duration of the conspiracy alleged in this Complaint;

d.    the nature and character of the acts performed by the Defendant and his co-conspirators in furtherance of the conspiracy;

e.    whether the conduct of the Defendant and his co-conspirators, as alleged in this Complaint, caused injury to the businesses or property of Plaintiffs and the members of the Class;

f.    the effect of Defendant's and his co-conspirators' conspiracy on Airfreight Shipping Services prices charged in the United States and throughout the world during the Class Period;

g.    whether the Defendant and his co-conspirators fraudulently concealed the alleged conspiracy so as to equitably toll any applicable statute of limitations;

h.    whether damages can be shown on a class-wide basis;

i.    the appropriate measure of damages sustained by Plaintiffs and members of the Class; and

44

j.      whether the Class is entitled to injunctive relief to prevent the continuation or furtherance of the violations of Section 1 of the Sherman Act alleged.

191.    Plaintiffs are members of the Class, having directly purchased Airfreight Shipping Services from one or more of the Airfreight Carrier Named Co-Conspirators.

192.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators.

193.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

a.      The Class is readily definable and one for which records should exist in the files of the Airfreight Carrier Named Co-Conspirators and other named and unnamed co-conspirators.

b.      Prosecution as a class action will eliminate the possibility of repetitious litigation.

c.      Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without the duplication of effort and expense that numerous individual actions would engender.

d.      Class treatment will permit the adjudication of relatively small claims by many class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint on an individual basis.

e.      This class action presents no difficulties of management that would preclude its maintenance as a class action.

194.    The Plaintiffs' claims are typical of the claims of other Class members.

195.    Plaintiffs are represented by counsel competent and experienced in the prosecution of antitrust and class action litigation and who will fairly and adequately protect the interests of the members of the Class.

196.    The Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of the Class with respect to the subject matter of this litigation.

## VIOLATION OF THE SHERMAN ACT

197.    During the Class Period, Plaintiffs and the Class paid for Airfreight Shipping Services directly to the Airfreight Carriers (or their agents, subsidiaries or controlled affiliates).

198.    During the Class Period, Defendant and his co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, or stabilize the prices of Airfreight Shipping Services and to allocate customers in the United States and throughout the world through the means described in this Complaint in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

199.    In formulating and effectuating the alleged contract, combination, or conspiracy, Defendant and his co-conspirators engaged in anti-competitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the prices of Airfreight Shipping Services.

200.    Defendant's and his co-conspirators' anticompetitive activities and their effects were in violation of the Sherman Act.

201.    Defendant's and his co-conspirators' anticompetitive activities and their United States effects were interdependent with their foreign effects and have proximately caused injury to the Plaintiffs and the Class both inside the United States and in foreign nations.

202.    Defendant's and his co-conspirators' anticompetitive activities both in the United States and in foreign nations have caused injury to Plaintiffs and the Class.

203.    Plaintiffs and the Class seek treble damages for their injuries, injunctive relief, and any such other relief that the Court deems necessary and appropriate.

204.    The combination and conspiracy alleged herein had the following direct, substantial and reasonably foreseeable anticompetitive effects, among others, upon commerce in the United States and upon foreign commerce:

a.    Price competition in the charging of and contracting for Airfreight Shipping Services has been restrained, suppressed and eliminated;

b.    The prices charged by the Airfreight Carrier Named Co-Conspirators to, and paid by, Plaintiffs and members of the Class for Airfreight Shipping Services were fixed, raised, maintained or stabilized at artificially high and noncompetitive levels;

c.    Plaintiffs and members of the Class have been deprived of free and open competition in the purchase of Airfreight Shipping Services in the United States and worldwide;

d.    Plaintiffs and members of the Class were required to pay more for Airfreight Shipping Services in the United States and worldwide than they would have paid in an competitive marketplace absent Defendant's and his co-conspirators' price-fixing conspiracy; and

e.    Competition in the sale of Airfreight Shipping Services has been restrained, suppressed or eliminated.

205.    During the Class Period, Defendant's and his co-conspirators' Airfreight Shipping Services Cartel directly and proximately caused Plaintiffs and the members of the Class to pay artificially inflated prices for Airfreight Shipping Services they would not have

47

paid absent such violations.  As a result, Plaintiffs and the members of the Class have been injured and damaged in their business and property in an amount to be determined according to proof.

206.    As a direct and proximate result of Defendant's and his co-conspirators' illegal Cartel, Plaintiffs and the members of the Class have been injured and financially damaged in their respective businesses and property in that they have paid artificially inflated prices during the Class Period that they would not have paid in the absence of the illegal conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and direct that reasonable notice of this action, as provided by Rule 23 (c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class identified herein;

B.    The Court adjudge and decree that the Defendant, and all other persons acting or claiming to act on behalf of any of them or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

C.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

D.    The Court enter judgment against the Defendant, jointly and severally, in favor of Plaintiffs and the Class for treble damages determined to have been sustained by them by virtue of Defendant's and his co-conspirators' violations of the Sherman Act, as allowed by law;

E.      The Court award all Plaintiffs and Class attorneys' fees and costs, and pre-

judgment and post-judgment interest as permitted by U.S. law; and

F.      The Court award Plaintiffs and the Class such other and further relief as may be

deemed necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

of the claims asserted in this Complaint so triable.

Dated:  February 12, 2010

By: /s/ Nathaniel L. Orenstein
Peter A. Pease (BBO 392880)
Nathaniel L. Orenstein (BBO 664513)
**BERMAN DEVALERIO**
One Liberty Square
Boston MA 02109
(617) 542-8300
(617) 542-1194

Michael D. Hausfeld
William P. Butterfield
Brent W. Landau
**HAUSFELD LLP**
1700 K Street, Suite 650
Washington, D.C. 20006
(202) 540-7200

*Co-Lead Counsel and Co-Lead Counsel*
*Principally Responsible for the Foreign*
*Claims*

Robert N. Kaplan (RK-3 100)
Gregory K. Arenson (GA-2426)
**KAPLAN FOX & KILSHEIMER LLP**
850 Third Avenue, 14th Floor
New York, NY 10022
(212) 687-1980

Gary L. Specks (GS-8767)
**KAPLAN FOX & KILSHEIMER LLP**
423 Sumac Road
Highland Park, IL 60035
(847) 831-1585

*Co-Lead Counsel*

Hollis L. Salzman
Jay L. Himes
Gregory S. Asciolla
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
(212) 907-0700

*Co-Lead Counsel*

Howard J. Sedran
Austin B. Cohen
Charles C. Sweedler
**LEVIN, FISHBEIN, SEDRAN
 & BERMAN**
510 Walnut Street
Philadelphia, PA 19106
(215) 592-1500

*Co-Lead Counsel*

**ADDITIONAL COUNSEL:**

Daniel Cohen
**Cuneo Gilbert & LaDuca, L.L.P.**
507 C Street N.E.
Washington, DC 20002
Telephone: (202) 789-3960
Facsimile: (202) 789-1813

Mark S. Goldman
**Goldman Scarlato & Karon**
101 W. Elm St., Ste 360
Conshocken, PA 19428
Telephone: (484) 342-0700
Facsimile: (484) 342-0701

Eric E. Castelblanco
**Law Office of Eric E. Castelblanco**
8383 Wilshire Blvd., Suite 302
Beverly Hills, CA 90211
Telephone: (323) 951-0180
Facsimile: (323) 951-0183

Noah Shube
**Law Office of Noah Shube**
434 Broadway, 6th Floor
New York, NY 10013
Telephone: (212) 274-8638

Michael Goldberg
**Glancy Binkow & Goldberg LLP**
1801 Avenue of the Stars, #311
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Jon P. Axelrod
Todd E. Palmer
**Dewitt Ross & Stevens S.C.**
2 East Mifflin Street, Suite 600
Madison, WI 53703
Telephone: (608) 255-8891
Facsimile: (608) 252-9243

Thomas Bright
**Gold Bennett Cera & Sidener LLP**
595 Market Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 777-2230
Facsimile: (415) 777-5189